**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

MICHAEL E. BARTKO,                    )        CASE NO.  5:08-cv-2364
                                      )
      Plaintiff,               )
                                      )
      v                        )        MAGISTRATE JUDGE VECCHIARELLI
                                      )
MICHAEL J. ASTRUE,                    )
  Commissioner of Social Security,    )
                                      )
      Defendant.               )        **MEMORANDUM OPINION & ORDER**

      Claimant, Michael E. Bartko ("Bartko"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Bartko's applications for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 416 (i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 423 and 42 U.S.C. § 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

      For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

## I.  Procedural History

      Bartko filed his applications for DIB and SSI on November 22, 2004.  Both

applications allege disability as of March 15, 2002. His applications were denied initially and upon reconsideration. Bartko timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), Cheryl M. Rini held a hearing on March 18, 2008, at which Bartko, who was represented by counsel, and Lynn S. Smith, vocational expert ("VE") testified.[1] The ALJ issued a decision on July 15, 2008 in which she determined that Bartko was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Bartko filed an appeal to this Court.

On appeal, Bartko claims the ALJ erred: (1) by failing to properly evaluate Bartko's mental impairments and by failing to include all of Bartko's limitations in the hypothetical question posed to the VE; (2) by failing to give proper weight the opinion of Bartko's treating physician; and (3) by failing to fully and fairly develop the record by prohibiting certain VE testimony.

The Commissioner disputes Bartko's claims.

## II.  Evidence

### A.  Personal and Vocational Evidence

Bartko was born on June 8, 1972. Transcript ("Tr.") 73. He was 32 years old at the time of his alleged onset of disability, and 35 years old at the time of the hearing. Bartko completed school through the eleventh grade. (Tr. 511). His past relevant work includes cook, sales person, stock person, carpet cleaner, meat cutter, and display erector. (Tr. 512-516).

---

[1]At the hearing, Bartko amended his onset date to November 1, 2004.

### B. Medical Evidence

On January 14, 2004, Bartko presented to Michael L Yutzy, D.O. with back pain, sinus, and red eyes.  Dr. Yutzy diagnosed lower back pain and a urinary tract infection. (Tr. 140).  On February 3, 2004, Bartko returned to Dr. Yutzy complaining of back pain. Dr. Yutzy diagnosed back pain and dysuria.  He recommended a physical therapy evaluation and referred Bartko to an orthopedic clinic for evaluation.  (Tr. 139).

A February 24, 2004, MRI of Bartko's mid-back was normal except for mild loss of disc height involving the T12-L1 disc space.  (Tr. 250).

On November 17, 2004, Bartko presented to the Crisis Intervention Center of Stark County ("Crisis Center").  Bartko stated that although he had an intake appointment scheduled at Nova Behavioral Health, Inc. ("Nova") for November 30, 2004, he was experiencing increased anxiety and depression and, therefore, presented to the Crisis Center.  Bartko reported he had had two previous crisis intervention admissions, in 1986 and 1998, and had attempted suicide when he was 14 or 15 years old.  (Tr. 170).  Bartko was diagnosed with depressive disorder, not otherwise specified and anxiety disorder, not otherwise specified.  He was assigned a Global Assessment Functioning ("GAF") score was 50.[2]  Bartko was admitted to the Crisis Stabilization Unit for stabilization of symptoms and a medication evaluation.  (Tr. 178).

---

[2]A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

3

Bartko was evaluated on November 18, 2004.  The evaluating physician[3] assigned Bartko a current GAF score of 40[4] and opined Bartko's highest past year GAF score was 60[5].  (Tr. 165).

Bartko was discharged from the Crisis Center on November 20, 2004.  At the time of his discharge, he was diagnosed with depressive disorder, not otherwise specified and anxiety disorder, not otherwise specified.  He was assigned a GAF score of 60.  Bartko was prescribed medication and told to follow up with Nova.  (Tr. 161-163).

On November 19, 2004, Bartko presented to Nova for intake evaluation.  (Tr. 146) Bartko reported that he had attempted suicide by choking.  (Tr. 150).  Bartko also reported that his father had hung himself when Bartko was 12 years old.  (Tr. 152). Bartko stated his work history was sporadic; his longest job lasted five years.  (Tr. 154). Bartko stated he had no interest in vocational services.   (Tr. 147).  He had been arrested for a DUI in 1999, but denied drug use beyond occasional social drinking.  (Tr.

---

[3]The physician's name is illegible.

[4]A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

[5]A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders, supra, at* 34.

4

147-148, 154).  The clinician[6] noted that Bartko presented no problems with his speech, thoughts, memory, concentration, sleep, appetite, insight, or  judgment.  (Tr. 154-156). Bartko was diagnosed with depressive disorder, not otherwise specified; personality disorder, not otherwise specified; and rule out adjustment disorder, mixed.  (Tr. 156). He was assigned a GAF score of 45.  (Tr. 157).

On December 2, 2004, Bartko presented to Barbara C. Lohn, M.D. for depression.  (Tr. 141).  Bartko reported he was sleeping better since he started the Trazodone.  He noted some problems with concentration since starting the Cymbalta, but felt it was helping.  He stated he enjoys going out to dinner and to the movies.  He has a girlfriend, and his relationship is going well.  (Tr. 141).  Bartko reported his mood was getting better; Dr. Lohn noted Bartko's affect was full.  Dr. Lohn diagnosed Bartko with major depressive disorder with anxious features and assigned a GAF score of 50, which she also opined was his highest GAF score in the past year.  (Tr. 143).

On December 2, 2004, Bartko presented to Joseph Lach, M.D. with lower back pain.  Dr. Lach noted minimal back pain and continued Bartko's medication.  (Tr. 291).

On December 21, 2004, Bartko presented to Edward Hill, M.D. complaining of depression and back pain.  Dr. Hill noted Bartko had difficulty getting on the examination table.  He diagnosed Bartko with back pain of unknown etiology, prescribed Neurontin and Vicodin, and referred plaintiff for an orthopedic consultation.  Dr. Hill opined that Bartko is presently totally disabled and will remain so until his problem is solved.  (Tr. 290).

---

[6]The clinician's name is illegible.

5

On January 26, 2005, Bartko presented to Edward Dunham, M.D. with recurrent back pain.  Dr. Dunham noted muscle spasms in Bartko's upper back and fair range of motion.  He prescribed Flexeril and Naprosyn.  (Tr. 289).

On March 24, 2005, Tonnie A. Hoyle, Psy. D. completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Bartko.  (Tr. 186-203).  Dr. Hoyle opined that Bartko's limitations did not meet or equal a Listing.  She opined that Bartko was mildly limited in his ability to maintain social functioning and to maintain concentration, persistence, or pace.  He was moderately restricted in his ability to carry on activities of daily living; he had experienced one or two episodes of decompensation of an extended period.  (Tr. 186, 196).  Dr. Hoyle further opined that Bartko was moderately limited in his ability to: (1) complete a normal workday or workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) respond appropriately to changes in the work setting; and (3) set realistic goals or make plans independently of others.  (Tr. 200-201).  Dr. Hoyle opined that Bartko appears capable of following simple to complex directions without significant difficulties and capable of performing work that does not involve strict time or production standards. (Tr. 202).

On April 11, 2005, Bartko presented to David K. Swope, M.D.[7], who completed a Mental Impairment Questionnaire.  (Tr. 204-208).  Dr. Swope noted that he had treated Bartko once a month for three months.  He diagnosed Bartko with major

---

[7]The ALJ notes in her decision that Dr. Swope's credentials are illegible.  (Tr. 15).  However, it appears his printed name is followed by "M.D." at Tr. 208.

depression, single episode and assigned a GAF score of 40.  (Tr. 204).  Dr. Swope

described the following clinical findings regarding Bartko: (1) sad; (2) dysphoric affect;

(3) PMR; (4) depressed mood; and (5) expressed hopelessness and helplessness.  Dr.

Swope opined that Bartko was not a malingerer, and Bartko's impairments were

reasonably consistent with the symptoms and functional limitations described in the

evaluation.  He further noted that Bartko had not yet had a robust improvement with the

medication.  (Tr. 205).

　　　Dr. Swope further opined that Bartko would have a difficult time sustaining a

regular job because his pain and mood would likely limit him physically; and his

depression would decrease his concentration and stress tolerance and increase his

irritability. He opined that Bartko's symptoms would cause him to miss work more than

three times a month.  (Tr. 207).  Dr. Swope opined that Bartko had: (1) slight

restrictions of activities of daily living; (2) marked difficulties in maintaining social

functioning; (3) frequent deficiencies of concentration, persistence or pace resulting in

failure to complete tasks in a timely manner; and (4) experienced three or more

episodes of deterioration or decompensation in work or work-like setting which cause

the individual to withdraw from that situation or to experience exacerbation of signs and

symptoms.  (Tr. 208).  Dr. Swope further opined that Bartko's impairment has or can be

expected to last at least 12 months.  (Tr. 206).

　　　Bartko presented to the emergency room with exacerbation of chronic back pain

on July 15, 2005, July 22, 2005, and August 4, 2005.  (Tr. 242, 238-240, 209-210).

　　　On August 12, 2005, plaintiff presented to Rudy Zarate, M.D. with back pain and

some numbness and tingling of the buttocks.  Dr. Zarate noted some palpable

7

tenderness in the paraspinal region, good motion of the bilateral lower extremities, and a negative straight leg test.  Dr. Zarate prescribe Flexeril and Ultram and referred Bartko to a chiropractor.  (Tr. 287).

On September 9, 2005, Bartko presented to Michael James, D.C.   Dr. James noted reduced lumbar and cervical range of motion and decreased sensation along the L4 dermatome.  Dr. James diagnosed chronic back pain of an unknown origin and performed soft tissue manipulation and therapeutic massage.  (Tr. 286).

On September 12, 2005, plaintiff presented to the emergency room with back pain and some numbness in his lower back and buttocks.  Bartko described his pain as a burning sensation that shoots from his lumbar spine to his thoracic spine. He rated his pain level at eight of 10.  The examining physicians determined that X-rays were not necessary because there had been no trauma to his back.  Bartko received a Toradol injection and was discharged.  (Tr. 235).

On September 22, 2005, Bartko presented to Dr. Dunham for follow up of his chronic back pain.  Bartko reported that he experienced some relief from the chiropractic treatment.  Dr. Dunham noted some muscle spasm and tightness in the paraspinal muscles.  Dr. Dunham diagnosed chronic low back pain and continued Bartko's treatment plan.  (Tr. 285).

Bartko presented to Dr. Dunham on December 5, 2005, for follow up of his chronic back pain.  Dr. Dunham noted marked tenderness of the mid back to waist level.  (Tr. 282).

Bartko presented to the emergency room on January 18, 2006, with back pain and a rash.  The examining physician noted some tenderness with palpitation,

8

continued Bartko on his current medication, and advised him to follow-up with his physician.  (Tr. 219).

On February 1, 2006, Bartko presented to Gertrude Cotiaux, M.D. with back pain radiating down his buttocks and thighs.  Dr. Cotiaux noted pain in the L1-S region, limited range of motion, and a slow, but normal gait.  (Tr. 280).

On March 30, 2006, Bartko presented to Paul Welch, M.D. for an evaluation of his back pain.  Dr. Welch noted bilateral muscle spasms in the paraspinal region, reduced range of motion in the lumbar spine, and moderate low back pain.  Dr. Welsh diagnosed lumbar sprain and recommended exercise in addition to medication.  (Tr. 335-336).

On April 25, 2006, Bartko presented to Trillium Family Solutions with depression and anxiety.  He reported that he had attempted suicide in November 2005 by ingesting Vicodin.  Bartko was diagnosed with panic disorder with agoraphobia and depressive disorder, not otherwise specified.  He was assigned a GAF score of 60.  ( Tr. 480-481).

On April 26, 2006, Bartko presented to Robert Erickson II, M.D. with back pain.  Dr. Erickson noted bilateral spasms, tenderness, and reduced range of motion.  Bartko received an epidural steroid injection.  (Tr. 331-334).  Bartko reported some relief from the first injection.  (Tr. 327).  Bartko received a second injection on May 22, 2006 and a third injection of June 12, 2006.  (Tr. 327-330, 319-326).

Dr. Cotiaux treated Bartko for his lower back pain several times from June 2006 through March 2007.  During this time she maintained him on a regimen of chronic pain

medication.  (Tr.  403, 400, 399, 393, 388, 384).[8]

On June 27, 2006, Bartko presented to Phoenix Rising Behavioral Health because he wanted to continue his medications for insomnia, anxiety, and depression. A diagnostic assessment was performed.  Bartko was diagnosed with generalized anxiety disorder and referred for outpatient treatment.  (Tr. 371-382).

On July, 19, 2006, Bartko underwent an Initial Psychiatric Evaluation.  (Tr. 367-370).  He was diagnosed with major depressive disorder, recurrent, dependent personality traits, and obsessive compulsive personality traits; he was assigned a GAF score of 70.[9]  (Tr. 365).  Bartko was prescribed psychotropic medications.  (Tr. 354).

On August 16, 2006, Bartko reported that he was feeling better.  The evaluator noted that Bartko's mood was improved and his affect was brighter.[10]  (Tr. 362).  Bartko continued to receive psychotropic medications from Phoenix Rising until January 3, 2007.  (Tr. 354).

On August 16, 2006, Bartko presented to Dr. Erickson for follow-up of his back pain.  (Tr. 316).  Bartko reported his symptoms improved for about three weeks after the injections, and then the pain returned.  (Tr. 316).  Dr. Erickson noted that Bartko

---

[8]Treatment dates were June 27, 2006; July 24, 2006; August 14, 2006; December 4, 2006; February 13, 2007;and March 1, 2007.

[9]A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra, at  34.*

[10]The signature of the provider is illegible and no credentials are noted.

10

had had three years of migrating pain throughout his back and legs but did not  have

obvious signs for it.  He stated Bartko's issue was very problematic to "work up". He

diagnosed Bartko with myofascial pain syndrome and lumbar sprain and advised him to

have additional tests.  (Tr. 318).

On September 5, 2006, Bartko returned to Dr. Erickson for his test results.  Dr.

Erickson stated, "We now have an arthritic direction...", and referred Bartko to a

rheumatologist for follow-up.  Dr. Erickson added the diagnosis of rheumatism,

unspecified and fibrositis.  (Tr. 315).

On September 25, 2006, Bartko presented to Rafael E. Arsuaga, M.D. pursuant

to Dr. Erickson's referral.  (Tr. 344-345).  Dr. Arsuaga opined that while Bartko did have

an elevated rheumatoid factor, he did not have the symptoms of rheumatoid arthritis

and more likely had osteoarthritis and chronic pain syndrome.  (Tr. 344-345).

 On October 24, 2006, Bartko returned to Dr. Arsuaga who opined that Bartko

had chronic pain syndrome with poor sleep and depression.  Dr. Arsuaga opined that

Bartko needed a sleep evaluation and psychotherapy.  He also stated that he did not

want to refer Bartko to a pain clinic because he was concerned they would simply

prescribe more narcotics.  (Tr. 343).

On December 28, 2006, Bartko returned to Dr. Arsuaga.  Dr. Arsuaga diagnosed

chronic pain syndrome and minimal osteoarthritis of the thoracic spine.  He opined that

Bartko could be gainfully employed as he has very few physical limitations. He further

opined that most of Bartko's limitations are psychological.  (Tr. 346).

On January 5, 2007, Bartko presented to the emergency room with worsening

back pain and right buttock pain. Straight leg raising worsened the buttock pain.  Bartko

was prescribed Vicodin and Valium.  (Tr.  426-428).

On February 5, 2007, Bartko again presented to the emergency room with back pain and cough.  He was prescribed medication and received a Toradol injection.  (Tr. 389-390).

On April 30, 2007, Bartko presented to Michael Rivera-Weiss, M.D. for pain management. (Tr. 383).  Dr. Rivera-Weiss noted mild back spasms, trigger points, and tenderness in the lumbar and thoracic regions.  He diagnosed minimal osteoarthritis of the thoracic spine, chronic pain syndrome, myofascial pain syndrome, addictive personality/narcotic-seeking behavior, history of depression and anxiety, and insomnia. Dr. Rivera-Weiss expressed concern about Bartko's veracity because Bartko denied using marijuana in the past two years, yet there was documentation that Bartko had used marijuana five months prior.  Dr. Rivera-Weiss stated that he would not use any type of opioid on Bartko and recommended continued psychological treatment.  (Tr. 383).

A psychiatric progress note dated June 6, 2007, states that Bartko reported feeling fairly well, except for his back problems and occasional anxiety.  The provider noted that Bartko's condition was stable.  (Tr. 435-436).

On August 10, 2007, Bartko presented to Karen Gade-Pulido, M.D. for a pain evaluation.  (Tr. 407).  Dr. Gade-Pulido stated that Bartko had persistent low back pain of uncertain etiology.  She further stated that while Bartko has a fair bit of muscle spasm across the low back consistent with myofascial pain, he does not meet the American College of Rheumatology's diagnostic criteria for fibromyalgia syndrome. (Tr. 409).  She noted that Bartko had a moderately antalgic gait, but could walk on his heels

12

and toes without much difficulty.  He had moderate limitations in his lower back range of motion, but had full muscle strength in his legs and a normal sensory examination. (Tr. 408).

On September 10, 2007, Dr. Hayek ordered a TENS unit for plaintiff, with an estimated lifetime need. (Tr. 445-446).

On September 14, 2007, Bartko presented to Dr. Gade-Pulido for follow-up.  (Tr. 411-413).  Dr. Gade-Pulido noted reduced lumbar range of motion, tenderness, and guarding.  She administered a trigger-point injection and provided Lidoderm patches. (Tr. 412).

On September 28, 2007, Bartko returned to Dr. Gade-Pulido.  Bartko reported that he did very well after the trigger point injection, but the pain gradually returned.  Dr. Gade-Pulido administered another injection and gave him a prescription for Lidoderm patches, which she noted seemed to help Bartko.  (Tr. 443-444).

On November 9, 2007, Bartko presented to Dr. Gade-Pulido for follow-up. Bartko reported the relief from the injection had lasted only a couple of days. (Tr. 456-457).  He stated he does receive relief from the TENS unit while he uses it and from the Lidoderm patches.  Dr. Gade-Pulido reviewed Bartko's previous films and noted they were essentially unremarkable.  However, Dr. Gade-Pulido ordered an MRI of the thoracic spine for further evaluation because the films were primarily of the lumbosacral spine, while Bartko's primary symptoms were in his thoracic spine.  (Tr. 456-457).

A November 28, 2007 MRI of the thoracic spine showed minor disc bulges in the lower thoracic spine but no significant spinal stenosis. (Tr. 421).  Minor degenerative

13

disc disease was noted. (Tr. 421).

On December 23, 2007, Bartko presented to the emergency room complaining of back pain.  (Tr. 418-420).  He had paraspinal tenderness in the thoracic region and was prescribed Flexeril and Vicodin. (Tr. 420).

On January 11, 2008 Bartko presented to Dr. Gade-Pulido for follow up and to review the results of his MRI.  She referred Bartko to her associate, Dr. Vladimir Djuric, for a consultation regarding injection therapy.  She also opined that physical therapy and a reconditioning program would be helpful, along with vocational rehabilitation.  (Tr. 454-455).

On January 24, 2008, Bartko presented to Phoenix Rising Behavioral Health for an updated annual psychiatric evaluation.  Bartko reported he felt much more stable on his present medication regimen.  Post-traumatic stress disorder was added as a rule out diagnosis, and Bartko was advised to follow up in 10 weeks.  (Tr. 430-431).

On February 5, 2008, Bartko presented to Dr. Djuric.  Dr. Djuric noted a guarded gait, moderately to severely limited range of motion, lumbar sprain/strain with ongoing lumbar somatic dysfunction, and mild degenerative disc disease of the lower thoracic spine.  Dr. Djuric administered an injection and noted only modest response. (Tr. 449-451).

On February 22, 2008, Dr. Gade-Pulido completed a Medical Opinion Re: Ability to do Work-Related Activities (Physical) Questionnaire. (Tr. 464-466). Dr. Gade-Pulido opined Bartko: (1) could lift and carry ten pounds occasionally and less than ten pounds frequently; (2) could stand or walk about two hours in an eight hour workday; (3) could sit for 30 minutes before needing to change positions; (4) could stand for 20

14

minutes before needing to change positions; (5) must walk around every 60 minutes for five minutes; (6) needs to be able to shift at will from sitting or walking or standing; (7) can occasionally stoop, crouch, and climb stairs; (8) can never twist or climb ladders; (9) is limited in his ability to push/pull; and (10) should avoid concentrated exposure to extreme cold.  Dr. Gade-Pulido further opined that Bartko would likely miss work twice a month due to his impairments.  (Tr. 464-466).

On April 3, 2008, Dr. Smith, at Phoenix Rising, completed a Mental Residual Functional Capacity Questionnaire.  Dr. Smith noted that Bartko had been receiving treatment since June 27, 2006.  (Tr. 483-485).  Dr. Smith diagnosed Bartko with major depression, recurrent and  personality disorder with dependent and obsessive-compulsive traits; he assigned Bartko a GAF score of 70 currently and as a past-year high. (Tr. 483).   Dr. Smith noted symptoms of sleep disturbance.  He opined that Bartko was not a malingerer, and his prognosis was good. (Tr. 483-84). Dr. Smith opined that Bartko would miss work about one day a month because of his impairments.  He opined that Bartko had slight restriction of activities of daily living; no difficulties maintaining social functioning; moderate deficiencies of concentration, persistence, or pace; moderate episodes of deterioration or decompensation in work or work-like settings; and no limitation in his ability to maintain regular attendance and be punctual.  (Tr. 485).

### C. Hearing Testimony

Bartko was born on June 8, 1972.  (Tr. 73).  He was 32 years old at the time of his alleged onset of disability, and 35 years old at the time of the hearing.  Bartko completed school through the eleventh grade.  (Tr. 511).  His past relevant work

includes cook, sales person, stock person, carpet cleaner, meat cutter, and display erector.  (Tr. 512-516)

Bartko testified that he takes numerous medications for anxiety, insomnia and pain, including: Xanax; Tramadol; Remeron; Lidoderm patch; Depakote; Vistaril; Lyrica and Skelaxin.  (Tr. 516-518, 541).  He also uses a TENS unit.  (Tr. 517).

Bartko testified that he has at least 20 bad days a month.  On bad days he has low back pain and numbness that is so severe he wants to cry.  He rates his pain on these days as eight to 10 on a pain scale.  He testified he has two or three good days per month.  On these days he can move around, and his back pain is not "killing" him constantly.  Bartko testified that the remainder of the days are in between days.  On these days he can move around and cook a little.  He rates his pain on these days at five or six on a pain scale.  (Tr.  529-530).

Bartko testified that he has shakiness in his hands daily lasting from five or ten minutes to a couple of hours.  He stated he was told the shakiness was due to anxiety or depression.  (Tr. 536).  Bartko also testified that he has trouble sustaining attention and concentration, and he has been diagnosed with sleep problems.  (Tr. 539, 537).

The ALJ asked the VE to consider an individual with the same vocational profile as Bartko, who: (1) can lift/carry only ten pounds occasionally and small objects frequently; (2) can sit at least six hours in an eight hour work day; (3) needs a sit/stand option such that he can sit only half an hour at a time, but then must be on his feet for a few minutes, not to exceed five minutes, but then can sit for another half hour, remaining at his work station during these postural changes; (4) can only occasionally push or pull and only occasionally use foot controls with both lower extremities; (5)

16

cannot climb ladders, ropes, or scaffolds; (6) can perform all other postural maneuvers on an occasional basis; (7) should avoid concentrated exposure to cold temperature extremes and concentrated exposure to vibration; (8) should avoid work at unprotected heights or around hazards on wet, slippery or uneven surfaces; (9) should not drive for work purposes; and (10) can only perform low stress work meaning no high production quotas.  (Tr. 546-547).

The VE testified that such an individual could not perform any of Bartko's past work, nor could he perform any work to which Bartko's skills would transfer.  (Tr. 547). The VE testified that such an individual could work as a lens inserter, order clerk, and ticket taker, which are all unskilled jobs at the sedentary level.  (Tr. 548).

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a

17

finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2005;

2.  The claimant has not engaged in substantial gainful activity since November 1, 2004, the amended alleged onset date...;

3.  The claimant has the following severe impairments: fibrositis and depressive disorder, not otherwise specified...;

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...;

5.  [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant can lift no more than ten pounds occasionally and small objects no more than frequently; and can sit no more than at least six hours in an eight hour workday.  Additionally, the claimant wold be limited to jobs with a sit/stand option such that he can sit only for one-half hour at a time, but then must be able to be on his feet for a few minutes, not to exceed five minutes, but then could sit for another one-half hour.  The claimant would also remain at the workstation during these positional changes.

18

Additionally, the claimant would be limited to standing no more than at least two hours in an eight-hour workday; pushing and pulling no more than occasionally; and using foot controls on no more than an occasional basis with both extremities (exertional).  In addition the claimant is restricted from climbing ladders, ropes, or scaffolds and can perform all other postural maneuvers on no more than an occasional basis.  The claimant is restricted from concentrated exposure to cold temperature extremes and vibrations (no work on vibrating surfaces no work with vibrating hand-held tools).  He is also restricted from work at unprotected heights, around hazards, and on wet, slippery or uneven surfaces.  The claimant is restricted from driving for work purposes and commercial driving.  Also, the claimant can perform no more than low stress work, meaning no high production or rapid production quotas (non-exertional).

6.  The claimant is unable to perform any past relevant work...;

7.  The claimant was born on June 8, 1972 and was 32 years old, which is defined as a younger individual age 18-44, on the amended alleged disability onset date ...;

8.  The claimant has a limited education and is able to communicate in English;

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled" whether or not the claimant had transferrable job skills...;

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform...; and

11.  The claimant has not been under a "disability" as defined in the Social Security Act from November 1, 2004 through the date of this decision....

(Tr. 10-12, 17-19)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial

evidence in the record to support the administrative law judge's findings of fact and

whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.,*

*348 F.3d 124, 125 (6th Cir. 2003)* ("decision must be affirmed if the administrative law

judge's findings and inferences are reasonably drawn from the record or supported by

substantial evidence, even if that evidence could support a contrary decision."); 

*Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has 

been defined as "[e]vidence which a reasoning mind would accept as sufficient to 

support a particular conclusion. It consists of more than a mere scintilla of evidence 

but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 

642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

### A. The ALJ Properly Accounted For Bartko's Mental Impairments In Her RFC Assessment

The ALJ accounted for Bartko's mental impairments by limiting him to no more 

than low stress work, meaning no high production or rapid production quotas. Bartko 

argues that this limitation is insufficient because it fails to adequately address the ALJ's 

Step 3 finding that Bartko has moderate difficulties with concentration, persistence or 

pace and is contrary to the evidence. Bartko's argument is without merit.

At Step 3 of the sequential evaluation, the ALJ must determine whether a 

claimant's impairment or combination of impairments meets or medically equals the 

criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If it does, 

then the claimant is disabled. If it does not, then the ALJ proceeds with the sequential 

analysis. *Abbott v. Sullivan*, 905 F.2d 918 (6th Cir. 1998)

In this case, the ALJ found that Bartko's impairment or combination of 

impairments did not meet or medically equal listing 12.04 paragraph B (20 C.F.R. Part 

404, Subpart P Appendix 1, § 12.04 B.) which requires the mental impairment to result 

in two of the following: marked restriction of activities of daily living; marked difficulties 

20

in maintaining social functioning; marked difficulties in maintaining concentration,

persistence, or pace; or repeated episodes of decompensation.[11]

In reaching this conclusion, the ALJ found that Bartko had moderate difficulties

maintaining concentration, persistence, or pace.  (Tr. 11).  Bartko argues that the ALJ

did not properly account for this finding in her RFC.  However, as the ALJ explained:

> The limitations identified in the "paragraph B" and "paragraph C" . . .
> criteria are not a residual functional capacity assessment, but are used to
> rate the severity of mental impairments at steps 2 and 3 of the sequential
> evaluation process. The mental residual functional capacity assessment
> used at steps 4 and 5 of the sequential evaluation process requires a more
> detailed assessment by itemizing various functions contained in the broad
> categories found in paragraphs B and C of the adult mental disorders
> listings . . . .Accordingly, I have translated the above "B" and "C"  criteria
> findings into work-related functions in the residual functional capacity
> assessment below.

(Tr. 12)

In accordance with the foregoing, the ALJ translated her "paragraph B" findings

into the RFC limitation to low stress work, meaning no high production or rapid

production quotas.  Bartko argues that while this limitation may address Bartko's

abilities with respect to pace, it does not adequately address his limitations with respect

to concentration or persistence. (Plaintiff's Brief on the Merits p. 15).  Bartko is

incorrect.  The limitation to low stress work adequately addresses Bartko's abilities with

respect to concentration and persistence.  *See Bartley v. Comm'r of Soc. Sec.*, 2008

WL 5216244, *8 (W.D. PA Dec. 11, 2008) (ALJ properly dealt with finding that Plaintiff

had moderate issues with persistence, pace, and concentration by including that she

_____

[11]The ALJ also found that the evidence did not establish the existence of the
paragraph C criteria.  (20 C.F.R. Part 404, Subpart P Appendix 1, § 12.04 C.) (Tr. 12).
Bartko does not challenge this finding.

was limited to simple, routine, low stress work with no deadlines and no fast-paced production); *Young v. Astrue*, 2008 WL 2857064, *5 (W.D. TX July 21, 2008) (Limitation to low stress work adequately accounted for finding of marked limitation in concentration, persistence and pace).

Bartko also argues that the RFC assessment is contrary to the opinions Drs. Hoyle, Swope, and Smith.  It is not.  The ALJ addressed each of these opinions and properly explained the weight she assigned to each.  The ALJ explained that she gave greater weight to Dr. Hoyle's opinion that Bartko should not have strict production standards. However, the ALJ found that no further restrictions were warranted because any exacerbation appeared to be episodic, and Bartko's symptoms generally appeared to stabilize with medication.  (Tr. 17).

The ALJ also gave greater weight to Dr. Smith's opinion because she found Dr. Smith's opinion to be generally consistent with the other findings of record.  Dr. Smith noted that Bartko's symptoms were managed with medication, and he proposed mild to moderate limitations.  Dr. Smith opined that Batrko may be absent one day per month, which the ALJ found consistent with her finding that Bartko can perform work on a regular and continuing basis.  (Tr. 17).

The ALJ assigned less weight to Dr. Swope's opinion, which she found to be unreliable and not supported by the overall objective medical evidence.  Specifically, the ALJ found no evidence to support Dr. Swope's opinion that Bartko has marked limitations in social functioning or concentration, or that he would have to miss work more than three times per month due to his impairments.  She did not find evidence in the record of three or more episodes of decompensation or evidence that Bartko

22

suffered from panic attacks. She noted that the record indicates that Bartko's medications are effective when taken, and she also noted that Dr. Swope's saw Bartko on a very limited basis over a three month period in 2005.  (Tr. 17).

Bartko has not argued that the ALJ erred in her analysis of these opinions, nor has he explained how these opinions are inconsistent with the RFC assessment. Further, Bartko has failed to articulate the additional limitations he believes should have been included in the RFC assessment or the specific evidence that would support such a limitation.

### B. The ALJ Properly Weighed Dr. Gade-Pulido's Opinion

Bartko alleges that the ALJ erred by failing to accord proper weight to his treating physician's opinion.  The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs., 708 F.2d 1048 (6th Cir. 1983).*  Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. § 404.1527(d)(3), 20 C.F.R. § 416.927(d)(3); *Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); Sizemore v. Secretary of Health and Human Services, 865 F.2d 709, 711-12 (6th Cir. 1988).*  Where there is insufficient objective data supporting the treating physician's opinion and there is no explanation of

a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.*, 803 F.2d 211, 212 (6th Cir. 1986). The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *4.

When the adjudicator determines that the treating source's opinion is not entitled to controlling weight, he is required to articulate good reasons for the weight given to the treating source's medical opinion. 20 C.F.R. § 404.1527(d) (2) and 20 C.F.R. § 416.927.

> [T]he ...decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *5.

The ALJ accepted in part, and rejected in part, Dr. Gade-Pulido's opinion. Specifically, the ALJ found that Dr. Gade-Pulido's opinion that Bartko would have to

miss two days of work per month was not supported by the record.  (Tr. 16).  As required, the ALJ gave specific reasons, supported by evidence from the record, for rejecting this portion of Dr. Gade-Pulido's opinion.  After explaining that Dr. Gade-Pulido's opinion is generally consistent with the overall objective evidence, the ALJ stated:

> I do not agree with her opinion that the claimant would have to miss two days of work per month.  Given medication efficacy and findings that the claimant has normal gait and station and not too much difficulty with heel-toe walking, I find that the record does not fully support such a limitation.  The claimant also stated that he is able to spend time with his daughter every other weekend and do household chores for several hours every other day, which shows that he has less "bad" days than asserted.

(Tr. 17)

The ALJ made several additional findings that also support her finding that Dr. Gade-Pulido's opinion is contrary to the evidence in the record.  The ALJ noted, among other things, that: (1) Bartko's laboratory findings were essentially normal; (2) clinical findings suggested that Bartko retained a non-disabling ability to sit, stand, and walk; (3) Bartko had no difficulty walking; (4) Bartko had a negative straight leg raising test and no numbness or tingling in his legs; (4) Bartko was able to walk to the emergency room despite rating his pain at the time as eight out of 10; (5) Dr. Gade-Pulido did not believe Bartko had the degree of muscle spasm expected with myofascial pain, nor did Dr. Hill; (6) X-rays showed only mild thoracic degenerative changes; and (7) Bartko had limited pain on palpation of his low back.  (Tr. 14).

Additionally, the ALJ noted that any exacerbation of Bartko's psychological symptoms appeared to be episodic, and the symptoms generally appeared to stabilize with medication.  (Tr. 14).

Regarding Bartko's asserted limitation with concentration and attention, the ALJ noted that: (1) an examination revealed that Bartko had a normal ability to sustain mental activity; (2) Bartko noted only slight concern with concentration in December 2004; and (3) Bartko denied concentration and memory problems in June 2006.  (Tr. 15).

As the forgoing illustrates, the ALJ gave specific reasons, which were supported by substantial evidence in the record, for rejecting part of Dr. Gade-Pulido's opinion. Accordingly, the ALJ did not err in her treatment of Dr. Gade Pulido's opinion.

### C. The ALL Did Not Err In Limiting The VE's Testimony.

Bartko argues that the ALJ erred in prohibiting the VE from testifying about the effect of Bartko's absenteeism on his employability.  Specifically, the ALJ prohibited the VE from answering Bartko's hypothetical question that included the assumption that Bartko would be absent from work twice a month.  (Tr. 548-550).  The question of whether this testimony was properly excluded need not be addressed because it is immaterial.  A VE's testimony must be based on a hypothetical question that accurately portrays the claimant's physical and mental impairments.  *Varley v. Secretary of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)  A hypothetical question need only include those impairments that are accepted by the ALJ, and may exclude impairments that the ALJ reasonably discredited.  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)  In this case, the ALJ properly rejected  Dr. Gade-Pulido's opinion that Bartko would miss work twice a month.[12]   Therefore, the hypothetical question to the VE

---

[12]She also properly discredited Dr. Swope's opinion that Bartko would miss work more than three times per month.  (Tr. 17).

adequately portrays Bartko's impairments.

## VII.  Decision

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.


s/*Nancy A. Vecchiarelli*
Nancy A. Vecchiarelli
U.S. Magistrate Judge


Date:  June 29, 2009